## Case No. 16,327.

UNITED STATES v. SMITH.

[3 Cranch, C. C. 66.] [1]

Circuit Court, District of Columbia. Dec. Term, 1826.

IMPRISONMENT FOR DEBT— DISCHARGE — PAYMENT OF POUNDAGE—AGREEMENT WITH MARSHAL.

A debtor of the United States had been discharged from custody by order of the president of the United States under the act of the 3d of March, 1817, and had entered into an agreement with the marshal for payment of his poundage fees by instalments, with a proviso that if any instalment should not be paid when due, the marshal should take out a new ca. sa. for his fees. *Held* that he could not be detained upon the new ca. sa.; and the court refused to order him to be committed.

The defendant [John K. Smith], upon being ordered by the president of the United States to be discharged from a ca. sa. issued for a debt due to the United States, and being still holden in custody by the marshal for his poundage fees, which amounted to more than $4000, agreed with the marshal to pay those fees by instalments, and that if he should make default, the marshal should obtain a new ca. sa. and arrest him again. He made default and the marshal took out a new ca. sa. in the name of the United States for his fees. Upon this new ca. sa. he was arrested and brought into court, and prayed to be committed.

Mr. Key, for defendant, objected, that the defendant having been discharged by order of the president of the United States under the act of March 3, 1817, 3 Stat. 399, entitled "An act supplementary to an act for the relief of persons imprisoned for debts due the United States," could not be arrested again for the same cause. The marshal having relinquished the hold he had upon the person of the defendant, could only resort to his action upon the new agreement. After the principal debt has been paid this court has decided, in the case of Causin v. Chubb [Case No. 2,527], at December term, 1805, that the marshal cannot detain the defendant for his poundage fees.

Mr. Lear, for the marshal, contended that that was the case of a ca. sa. under the Maryland law, entered "Not called by consent," in which case the plaintiff may always have a new ca. sa.

But THE COURT (nem. con.) refused to order the defendant to be committed.

---

## Case No. 16,328.

UNITED STATES v. SMITH.

[4 Cranch, C. C. 629.] [1]

Circuit Court, District of Columbia. Nov. Term, 1835.

GAMING—CONSTRUCTION OF STATUTES.

The first and twelfth sections of the penitentiary act of the District of Columbia, so far

[1] [Reported by Hon. William Cranch, Chief Judge.]

as they relate to the offence of keeping a faro-bank, or other common gaming-table, are to be construed together; and, when so construed, they contain a complete description of the offence and its punishment.

This was an indictment [against Henry Smith] under the act of congress of March 2, 1831 (4 Stat. 448), entitled, "An act for the punishment of crimes in the District of Columbia," commonly called the "Penitentiary Act." The offence charged was the keeping "a common gaming-table, called a 'sweat-cloth.' "

The defendant having been convicted, his counsel, Mr. Dandridge, moved, in arrest of judgment, contending that the term "gaming-table," in the twelfth section of the act, was too vague and indefinite to support an indictment, and must be confined to the single offence of keeping a "faro-bank;" as the English statute against stealing "sheep or other cattle," was confined to the stealing of sheep; and the statute against stealing horses did not include a man who stole only one horse. 1 Bl. Comm. 88; 6 Bac. Abr. tit. "Statute"; Plow. 465. It was also contended, that, in the twelfth section, the words "faro-bank or gaming-table," mean nothing more than faro-bank; the words "or gaming-table" being only expletive of the term "faro-bank."

Mr. Key and Mr. Carlisle, contrà, contended, that, in considering a statute, the intention of the legislature is the only sure guide to its construction, and that the first and the twelfth sections are to be construed together, so as to read, "a faro-bank or other common gaming-table."

THE COURT (THRUSTON, Circuit Judge, contrà) refused to arrest the judgment.

CRANCH, Chief Judge, delivered the opinion of the majority of the judges, as follows: This is an indictment for keeping "a certain common gaming-table, called a 'sweat-cloth,' against the form of the statute in such case provided, and against the peace and government of the United States."

The jury having found the defendant guilty, his counsel has moved, in arrest of judgment, and contends that this indictment is under the twelfth section of the penitentiary act of March 2, 1831, by which it is enacted "that every person duly convicted of keeping a faro-bank or gaming-table, shall be sentenced to suffer imprisonment and labor for a period not less than one year, nor more than five years." That the words "gaming-table" are too general, and will not maintain an indictment; and that, if any offence can be punished under that branch of the statute, it is only the offence of keeping a faro-bank. That there is no punishment, provided by the statute, for the offence of keeping a common gaming-table; and that the words "or gaming-table" are intended to be used as synonymous with "faro-bank," and are merely expletive, not cumulative. That the statute ought to be construed strictly, like the statute against stealing "sheep or

other cattle," which, it was supposed, was, by construction, confined to the stealing of sheep; and the statute against stealing horses, which, it was supposed, had been construed not to extend to a person who stole one horse only. But this indictment was not framed upon the twelfth section alone. It is founded on the first and twelfth sections. By the first section it is enacted that every person who shall be convicted, in any court in the District of Columbia, of any of the offences therein enumerated, and among others, "of keeping a faro-bank or other common gaming-table," "shall be sentenced to suffer punishment by imprisonment and labor for the time and times hereinafter prescribed, in the penitentiary for the District of Columbia." And by the twelfth section it is enacted "that every person duly convicted" of "keeping a faro-bank or gaming-table," shall be sentenced to suffer imprisonment and labor, for a period not less than one year, nor more than five years. The first section is complete in itself in regard to the description of the offence, the place where committed, the court in which the conviction must be, the nature of the punishment, the place of imprisonment, and the tribunal to pass the sentence. It does not fix the term or period of the imprisonment and labor by express words; but it does so by reference to a subsequent part of the act, where the offence was to be again brought into view, and the period of imprisonment and labor limited. This is done in the twelfth section, where the sentence for keeping a faro-bank or gaming-table is to be for a period of not less than one nor more than five years. The first and twelfth sections, construed together, as they ought to be, complete the legislation upon that subject, and leave no doubt as to the designation of the offence, the tribunal and place in which the conviction is to be had, and the sentence passed, and the nature, extent, and place of punishment.

It has, however, been suggested that the twelfth section can derive no aid from the first; because the first is to be considered merely as a preamble enumerating the offences which the legislature intended to subject to penitentiary punishment; and that the twelfth section is a substantive and independent enactment, and the only one which subjects the offence of "keeping a faro-bank or gaming-table," to punishment in the penitentiary. But any one who reads the first section, must see at once, that it is not a mere preamble, but is as substantial an enacting clause as any other in the whole act. It is indeed the most substantial enacting clause in the act; for there is no other section of the act, except the fourteenth (and that applies only to capital cases other than murder, treason, and piracy), which informs us where the crime must be committed, or by what tribunal, or in what place the sentence is to be passed, or whether the imprisonment and labor are to be in the penitentiary

of the District of Columbia, or in any other penitentiary.

Let us, for a moment, consider the twelfth section as standing alone, and deriving no aid in its construction from any other part of the act. The words are: "Sec. 12. And be it further enacted, that every person duly convicted of obtaining by false pretences any goods or chattels, money," &c., "or of keeping a faro-bank or gaming-table. shall be sentenced to suffer imprisonment and labor for a period not less than one year nor more than five years." (1) "That every person duly convicted"; where? In Maryland? or Virginia? or the District of Columbia? or before what tribunal? The section is silent on these points. (2) "Of keeping a faro-bank or gaming-table"; where? The section is silent. (3) "Shall be sentenced"; where, and by what tribunal? The section is silent. (4) "To suffer imprisonment and labor"; where? In the penitentiary of the District of Columbia? or in any other penitentiary? or in any common gaol? Upon all these questions the section is silent. It is an act of the congress of the United States, and there is nothing in the twelfth section to confine its operation to this district, or its tribunals; or to acts done within the district.

Now consider the first section. "Section 1. Be it enacted," &c., "that from and after the passage of this act, every person who shall be convicted in any court in the District of Columbia, of the following offences, namely, manslaughter," &c., enumerating several offences; and among the rest, "obtaining by false pretences any goods or chattels, money," &c., "or of keeping a faro-bank, or other common gaming-table," &c., "shall be sentenced to suffer punishment by imprisonment and labor, for the time and times hereinafter prescribed, in the penitentiary for the District of Columbia." (1) "Every person who shall be convicted in any court in the District of Columbia." This answers the first question which arose in considering the twelfth section; namely, where must the conviction be? The first section says in some court in the District of Columbia; and this answers also the second question which arose upon the twelfth section, namely, where must the offence be committed? For if the conviction is to be in a court in the district, the offence must have been committed in the district or the court could not have had jurisdiction, and the offender could not have been convicted. It also answers the third question raised upon the twelfth section, namely, where and by what tribunal must the sentence be passed? For if the conviction must be in a court in the district the sentence must be also; for one court cannot pass sentence upon an offender upon a conviction in another court. (2) Again, the first section says that the offender "shall be sentenced to suffer punishment by imprisonment and labor for the time and times hereinafter prescribed, in the penitentiary for the District of Columbia."

This answers the fourth and last question which arose upon considering the twelfth section, namely, where is the offender to suffer imprisonment and labor? So far, then, is the first section from being a mere preamble, that it is the only effectual enacting clause. Without it, the twelfth section, and all the other sections limiting the period of imprisonment and labor, would be of no avail. It is evident that their only purpose and office is to fix and limit the time of imprisonment, and apportion it to the respective offences enumerated in the first section; that they ought to be considered as having no other use; and that the first section ought to be construed as if the several limitations of the time of imprisonment and labor had been immediately applied to the respective offences as they were enumerated in that section. The first section, so far as it relates to this subject, would then read thus: Every person who shall be convicted in any court in the District of Columbia, of keeping a faro-bank, or other common gaming-table, shall be sentenced to suffer punishment by imprisonment and labor, for a period not less than one year nor more than five years, in the penitentiary for the District of Columbia. This we think is the true construction of the act.

But it has been said that the twelfth section does not fix or limit the degree of punishment for keeping a common gaming-table. The answer to this suggestion is that the twelfth section has fixed and limited the degree of punishment for keeping all sorts of gaming-tables, which, of course, includes common gaming-tables. But to this it is objected that the word "gaming-table," is too general and vague to be the subject of a penal enactment. That it cannot be supposed that congress meant to make it a penitentiary offence if a gentleman should play a game of whist with his guests in his own house; and that as they could not have meant that, they meant nothing; and that therefore the twelfth section is to be confined to the punishment of the faro-bank only. Here, then, we are obliged to resort to construction; for the plain words of the section are that "every person duly convicted of keeping a faro-bank, or gaming-table, shall be sentenced," &c. By these words, he, who keeps a gaming-table, is equally guilty with him who keeps a faro-bank; and therefore, in order to get rid of these words of the section we must resort to construction. But when we resort to construction we are bound by the rules which the law has laid down for the construction of statutes. The first and great rule of construction is to ascertain and carry into effect the will and intention of the legislators; and the second is that in order to learn that will and intention, not only every part of the statute, but every other statute in pari materiâ, and even the preambles of statutes, are to be considered. A third rule is that although penal statutes are to be construed strictly, yet even in these the intention of the legislature is to be regarded. Heydon's Case, 3 Coke, 7. By these rules of construction, then, in order to ascertain the extent of the term "gaming-table," as used in the twelfth section, we must compare that section with the first; and there we find that it was the intention of the legislature to punish the keeping of common gaming-tables only; and that for the degree of punishment they refer to a subsequent section; which, it is evident can only be the twelfth, because that is the only subsequent section in pari materiâ. The rule that penal statutes are to be construed strictly, then comes in and says that the general and comprehensive term, "gaming-table," must be limited to common gaming-tables. Thus the two sections will be perfectly reconciled, and the intention of the legislature carried into effect. To say that the word "gaming-table," in the twelfth section, has no meaning, or is to be disregarded because it is too general; or is merely a synonyme with the word "faro-bank," is to violate that rule which requires a statute to be so construed "that if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." Bac. Abr. tit. "Statute" 1, 2; Rex v. Berchet, 1 Show. 108. It would also leave the case, of keeping a common gaming-table, unpunished; contrary to the clearly-expressed intention of the legislature in the first section; unless, indeed, the common-law discretion of the court, in punishing misdemeanors by fine and imprisonment, should be considered as applicable to a misdemeanor which the legislature has enacted shall be punished by imprisonment and labor in the penitentiary without limiting the time of such imprisonment, considering labor and imprisonment as only a substitute for fine and imprisonment. But upon this it is unnecessary to express any opinion. A construction which would defeat the plain intention of the legislature, ought, if possible, to be avoided; and especially when a reasonable construction can be given which will carry that intention into effect. A majority of the judges are quite satisfied that the construction which we have before intimated is the true construction of the statute, and that the motion in arrest of judgment must be overruled.

THRUSTON, Circuit Judge. This is a prosecution, under the penitentiary law, for keeping a gaming-table, and the motion is in arrest of judgment. The matter of law for the consideration of the court, on this motion, is, whether an indictment, charging the keeping a (common) gaming-table called a "sweat-cloth," can be sustained under the said law. I should have not much doubt, from the liberal construction given to penal statutes in modern decisions of the courts, that if the description of the offence contained in the first section of the penitentiary act, had been followed out in the twelfth section which annexes the punishment, that the indictment might be sustained; but there is a material, and, in my view, fatal variance. The first section con-

templates the prohibition of, and the punishment for, keeping a faro-bank or other common gaming-table; and had any subsequent section pursued this description, and followed it with a specific punishment for the offence, the case might have been sufficiently clear, and the offence sufficiently set out to sustain the present indictment; but what is the offence set out in the twelfth section? It is the keeping a faro-bank. or gaming-table; now here is a material and most important distinction. If the words, "or gaming-table," can, by any reasonable interpretation and rules of construction, admit of an intention in congress to have made penal the keeping any kind of gaming-table, other than a faro-bank, which I cannot admit however; then we see an utter want of harmony between the offence set out in the twelfth section, and the one contemplated as a subject of subsequent specific legislation in the first section. They (congress) omitted, in the twelfth section to make provision for the offence as set out in the first section; it is a casus omissus, and must be supplied, if deemed proper or necessary, by future legislation. The act is carelessly drawn, which is manifest in another instance; the first section, in enumerating the offences to be provided for in the subsequent sections, mentions, among them, "petty larceny"; if this means any thing, it must mean petty larceny as a description of offence then well known and settled. Still you find nothing of petty larceny in the subsequent provisions; the law makes, or creates a new constructive petty larceny, extending the sum necessary to constitute it far above the amount necessary to constitute petty larceny at the time of the passage of the act; it is true they have fixed a sum, the stealing under or over which makes the punishment penitentiary confinement, or only fine and imprisonment in the common jail; here is another casus omissus, for the crime or offence called "petty larceny," although enumerated in the first section as one of the offences to be specifically punished, is not afterwards mentioned throughout the law.

But to return: for what offence of gaming is punishment actually (not contemplatively) provided for? Why the keeping a faro-bank or gaming-table; and what is the difference, it may be asked? I answer substantial, essential, and most important; that characteristic word "common" is wanted; a word which alone gives existence, I may say vitality to the offence; in which alone lurks the poison baneful to society, which is an essential and indispensable element of every nuisance; without which the same act is no nuisance. "Common," means, in the sense in which it is used in the first section, "public," and "common" sense too; and so it will be found in the best expounders of the meaning of words. There is another important word also, in setting out the offence intended, or rather contemplated to be specifically animadverted on, in the subsequent section; namely, the word "other." Now this word,

"other," so separates and disunites the subsequent words, "common gaming-table," from the preceding words, "faro-bank," as to leave no doubt that other common gaming-tables than faro-banks, were in the contemplation of congress to be prohibited, and the keeping of them punished; but there is no punishment provided for them: had the twelfth section gone to the extent of the first, no doubt could exist, I should think, as at present advised, that they would have embraced sweat-cloths or tables. among the prohibited games. But I give no opinion as to this because there is enough to arrest the judgment without considering particularly the result of an accordance between the crimes contemplated to be punished and those actually punished.

Again, shall it be said (as I think I heard intimated) that the first and twelfth sections may be taken together, and the defects in the twelfth may be supplied, and the meaning and intention of the legislature gathered therefrom. How is this? because in the first section they denounce the keeping of a common gaming-table, and neglect afterwards to provide any punishment for it, shall we be bold enough to send any one to the penitentiary for keeping a common gaming-table? I have read of preambles affording a clue to unravel a doubtful meaning as to the sense of subsequent enactments in the same statute, by affording a view of the policy of the statute, and the public evil intended to be remedied by it; but I never heard of their being actual enactments, or as supplying the place of them. If a statute were to propose to punish any offence, and to denounce it with all the terms of reprobation which ingenuity could invent, or the enormity of the offence about to be punished could justify, still if the legislature omitted to carry its denunciations into effect, the law would be of no avail. But can you, from the preamble, supply, in the prohibitory and actual penal enactment, the very gist and essence of the crime? Can the words in the twelfth section "faro-bank or gaming-table," be made, with the help of the first section, to be equivalent with "faro-bank or other common gaming-table?" The first section declares that the keeper of a faro-bank or other common gaming-table, "shall be sentenced to suffer punishment by imprisonment and labor in the penitentiary," &c., "for the time and times hereinafter prescribed." Well, through the whole law you find this crime not noticed; but in the twelfth section it is true that there is a definition of crime something like it: something akin to it, but falling far short of it in essential characteristics, which is punished by confinement, &c., and these important characteristics may be supplied, we are told, from the first section. What! supply the only word which is essential? which is the soul of the crime; in which alone the public weal could be concerned, namely, "publicity"? Who will say, that when the law is advanced as far as the twelfth section, the

framers of it might not have changed their intention, and softened the severity of the contemplated provision in the first section? All that the first section shows is, that they did intend to punish a certain crime, but this intention is not carried into effect; but the only offence like this one actually provided for, is a different one in substance and essence. To say the best of it, perhaps, is to say that the legislature overlooked it; it is a casus omissus. Let us now come to the twelfth section as it stands in its crippled condition, not propped up by the first section. What do the words "keeping a faro-bank or gaming-table," mean. In my opinion they mean only a gaming-table called a "faro-bank," and no other kind of gaming-table. Now let it be considered that "faro-bank" is no term known to our laws; there is no certain, legal, or established technical meaning attached to the term. Had the words "faro-bank" stood alone as designating the offence, it might be very equivocal, whether some other bank than a gaming-bank might not be intended. When a new offence is about to be punished, circumlocution is used to describe it; and as the words "faro-bank" were used as descriptive of the offence, it was reasonable to make it more certain by adding the words, after the disjunctive "or," "gaming-table," to put it beyond all uncertainty, and that a gaming-table, vulgarly denominated a "faro-bank," was intended to be the subject of animadversion. Now as to the denomination, the act of Maryland of 1797 (chapter 110) uses the word "faro-table," and declares it to be one of the devices used for gaming; and this term, and not "faro-bank," was known to the law as a "gaming-table," and had it been used instead of "faro-bank," there might have been less necessity for those explanatory words, "or gaming-table." If arson, rape, robbery, or perjury are the subjects of legislative prohibition or punishment, they per se ex vi terminorum, are descriptive of the offence, and sufficiently certain. They carry with them and in them a full and perfect exposition or definition of the offence; no explanatory words or circumlocution are necessary; but where shall we look for the meaning and technical offence inherent in the words "faro-bank"? Suppose a prosecution commenced for keeping a faro-bank: would it not be a preliminary question, what is a "faro-bank"? Neither the law, nor any judicial precedents, furnish an adequate or settled meaning of the term; you have to resort to evidence to ascertain what a faro-bank is, in which case there may be great diversity of opinion among the learned in the gambling republic, and thus great uncertainty as to the offence the law meant to punish. Would it not be curious to have witnesses before a jury to tell us what murder, arson, rape, or robbery is? We hear facts, and the law defines crimes; if the evidence prove facts amounting to the established and settled characteristics of the crime, the court are judges of the sufficiency of the evidence, and adjudge the party guilty of the crime charged. We look not to evidence, not to the opinion of witnesses, for what constitutes offences known and settled in the law; so that the legal denomination in one word comprises all the constituents of the crime. Not so with the term "faro-bank;" it is unknown to the law, and is no technical description per se of any offence. Therefore, when the legislature mean to punish any act not known and established as a crime by some legal and technical and certain characteristics, it resorts to descriptions and specifications of the facts and circumstances which are to constitute the prohibited act; they would not be satisfied, nor would there be any certainty in it, to prohibit and punish the act, merely by its vulgar, and popular name; and, therefore, it was proper to superadd the words, or "gaming-table," to illustrate more specifically the meaning of the words "faro-bank." But with the explanation it is still very loose; but if deemed sufficiently explanatory of the meaning attached to the words "faro-bank," it has nothing to do with a sweat-cloth, or sweat-cloth table. A faro-bank or gaming-table, is only an alternative expression of the same thing. It would be a forced construction to say that when one offence was mentioned, that using another more generic or explicit term, separated from the first by the disjunctive, "or," that all kinds of offences which might fall within the scope of this generic term were intended to be embraced in it. It is most consistent with the rules of construction, to consider the latter words as merely an alternative description of the offence not so clearly expressed or defined in the first term. But suppose they were meant as distinct and independent offences, let us see how the matter would then stand. To say nothing of the absence of any legal, known, technical meaning of the words, "faro-bank," and the necessity of resorting to the uncertainty of human testimony to ascertain what a "faro-bank" is, I would ask if the words have a known and definite meaning? Is not betting at a faro-bank essential to constitute the keeping it an offence? Then take away the explanatory words, "or gaming-table," or consider them as independent of the words, "faro-bank," and creating a distinct offence; then the keeping a faro-bank without any betting, or gaming, would fully come within the prohibition, and might be accordingly punishable; can this be the meaning of the legislature? Then take the latter branch of the alternative prohibition, and say that the words, "or gaming-table," mean to prohibit all sorts of gaming-tables, then private gaming-tables are prohibited, and a person having a party of friends at his house, keeping a whist, or loo-table (and nothing is more common), he comes within the prohibition, and is liable to the penalty. Could

this have been the intention of the legislature? No. Gaming-tables must be common, or public, to make them nuisances, and, as such only, are punishable. Whatever rigid moralists may desire as to the correction of private as well as public morals, legislatures have never gone so far as to visit with vindictive penalties the pleasures or amusements of private families; these are left to the gradual influence of public opinion, or are proper subjects for the press, the pulpit, or writers and lecturers on moral duties.

The conclusions, therefore, to which the foregoing considerations lead my mind, are, that whatever the intention of the legislature might have been to provide, in the specific punishments for the crimes enumerated in the first section of the act, that if they have omitted to provide for any one of them, that one is not punishable. That there is no section of the law, subsequent to the first, that makes the keeping a faro-bank, or other common gaming-table, an offence, or provides any punishment for such offence, by such description of the offence, or other equivalent descriptive words. That the offence set out and punished in the twelfth section, is not the offence of keeping a faro-bank, or other common gaming-table, but only the keeping a faro-bank, or gaming-table; a distinct offence, and not identical in language, meaning, or substance, with those in the first section. That you cannot supply the defect of description, by any aid to be derived from the first section, because there is an important, substantial, and essential difference in the two descriptions of offences, to wit: the word "common" is wanting in the latter, which, being the very essence of the offence, can no more be intended, than you can intend, from the preamble of a statute, important words, essential to constitute the crime which the enacting clause professes to punish, because the offence is among those which the preamble contemplates to punish. For example: Suppose the penitentiary act, among the enumerated offences, contained that of murder, which it proposed to punish by penitentiary confinement, instead of capitally; when you come to the clause providing for the punishment of the offence, it is described thus: "Whoever shall kill another, shall be punished by confinement," so and so; could you, because the first section enumerated murder among the crimes to be punished, supply the material and characteristic words, "with malice prepense," from the preamble, or (what is tantamount to a preamble, or is, at least, in the same category) the first section of the act in question.

According to this view of the case, the description of the offence in the twelfth section must be taken alone, and independent of, and unaided by, the first section, whether they be taken together as descriptive of one offence, or separately, as descriptive of two offences. I have endeavored to show that the words are descriptive, and intend only one offence, and shall not repeat what I have said as to their being alternate descriptions of the same offence, but will only make one remark: Can I judicially know that a faro-bank is a gaming-table? In what book shall I look to know this? I do find a faro-table recognized in the Maryland act of 1797 (chapter 110), but no faro-bank. If, then, the expression, "keeping a faro-bank or gaming-table," means two distinct offences, then, by strong implication, a faro-bank is not a gaming-table, because a gaming-table, being a generic term, would necessarily include the species, faro-bank. But if you will place them in antithesis, and faro-bank is not a species of the genus gaming-table (and a very extensive genus it is), then faro-bank is a very innocent and harmless diversion, and never was intended to be, nor could be, without great absurdity being ascribed to the legislature, denounced as a crime. The only rational interpretation of the words describing the offence in the twelfth section, is, that the words, "or gaming-table," are but an alternate and more precise description of a faro-bank, and inform us that a faro-bank is a gaming-table, without which we could not judicially know it.

The result of the foregoing conclusions is, that a sweat-cloth, or rag-table, is not within the provisions or prohibitions of the twelfth section; and as, according to my view, it cannot be extended, even in these more philosophical days of liberal construction, by any aid or support drawn from the preamble, or first section, an indictment for such offence cannot be sustained.

I will add one more remark; all that I have said in the foregoing opinion is exclusively with reference to the case before us, namely, the keeping a sweat-table. It is probable, from what I have observed, that we may have motions in arrest of judgment for keeping faro-banks; therefore I do not mean that any thing in this opinion commits me, one way or the other, as to this latter offence; if a question on such indictment is made, I shall consider it with all the deliberation in my power. I believe, however, that this particular species of gaming was the one intended by the statute to be suppressed. There is another important word, used in the description of the offence, which deserves much consideration; and this is the word "keeping," both in the first and the twelfth sections. The meaning of this term, as I understand it, gives strength to the intimation, in the close of my argument, that no gaming-tables but faro were intended to be denounced and punished by the act; or, at most, none but such as were fixed, and permanently, or at least, for a considerable period, established; so as to be

places of known and common resort. What is the true import of the verb, "to keep?" Does it not import something more than setting up a table for a day, or during the races, if the proof had so established the fact, which, however, it did not, because the testimony in all the cases tried this term, went to the extent only of a single exhibition of a gaming-table on one day only; or proved only one act of playing, or gaming, by the setter up. Now, can the term "keeping" embrace such a case as this? If I understand the meaning of the term, it implies some duration or permanency; and that the opening, or instituting, or setting up a gaming-table for one day, or a few days during a public race, if the evidence even went so far, is not keeping a gaming-table within the meaning of the statute. Let us endeavor to ascertain the true import of the term, by illustrations drawn from common usage, as well as from the best dictionaries. That it is never employed to signify any temporary business or employment or engagement, is evident from innumerable instances where this verb is used, as in the following instances. This is a rule, as far as I know, without exception. If there be one, I have not discovered it. We say he keeps an hotel, a store, a billiard-table, a register's office, a broker's office, a coach, a horse, a gig, an omnibus, carts for hire, a livery-stable, a school, a mistress, &c. Now, does not every instance in the examples above quoted show, that the word is only employed in cases of expressing the idea of some permanent and established business? That congress meant only to strike at those known and established gaming-tables, such as faro, I have no doubt, for the reasons hereinbefore given, but because those dangerous resorts were best known, were prominent in importance and danger, and, therefore, were the particular and exclusive subjects of legislation. They never meant to invade the precincts of the race-field, that annual jubilee of immemorial usage, where the species of petty gambling during the jubilee has been coeval with the festival itself; and tolerated by all the legislatures of the states where this species of annual amusement has been in use. They hardly meant to visit, with the enormous penalty of penitentiary confinement, the poor negroes who kept their fippenny-bit sweat-cloths or rag-tables, during this period, and on this theatre of almost universal relaxation of discipline during this festival. I have no dictionary at home except Ainsworth's. The Latin word which seems to me to express, most nearly, the English word to "keep," is "sustentare," and this word, in that language, implies to maintain, support, &c., extending its operation and effect beyond the ephemeral existence of a day. I am unable to give any etymological history of the word, for the want of the proper books,

but collect its true import, not only from the corresponding word in another language, from which many of our words are derived (though the verb, "to keep," is not, but is most probably of Saxon or Teutonic origin), but from the sense in which it is, without exception, used in common parlance, and usus est jus et norma loquendi.

[Subsequently the counsel for the defendant moved for a new trial, which was granted by the court, MORSELL, J., dissenting. Case No. 16,329.]